**AFFIRMED and Opinion Filed September 17, 2021**



**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-21-00244-CV**

**IN THE INTEREST OF I.D. & A.D., MINOR CHILDREN**

**On Appeal from the 354th Judicial District Court**
**Hunt County, Texas**
**Trial Court Cause No. 88200**

## MEMORANDUM OPINION

Before Justices Myers, Partida-Kipness, and Garcia
Opinion by Justice Garcia

Appellant is Father of the minor children I.D. and A.D. He appeals a judgment terminating his parental rights in the children, raising two sufficiency-of-the-evidence issues. We affirm.

## I. Background

This case began in November 2019 when the Department of Family and Protective Services filed a petition for the protection of twin children I.D. and A.D., who were about two months old. The Department identified the children's mother by name as a party to be served and alleged that the identity of the children's father

was unknown. The trial judge signed a temporary order naming the Department as the children's temporary sole managing conservator.

On February 4, 2020, the Department filed a first amended petition identifying Father by name as the children's alleged father. The next day, Father appeared in person at a status hearing and said on the record that he was the children's father. Mother also testified at the hearing that Father was in fact the children's father. At the same hearing, a caseworker testified that she had created a service plan for Father, she had gone over it with him, and he appeared to understand what was required of him. She also testified that she explained that his parental rights could be restricted or terminated if he did not timely complete his services. That same day, the trial court ordered genetic testing to determine Father's paternity.

On Friday, July 17, 2020, there was a permanency hearing at which Father's attorney appeared. A CASA worker testified that Father "hasn't completed DNA testing and . . . he hasn't been completing the drug test, as well." The trial judge orally ordered both Mother and Father to submit to drug testing by 5 p.m. on the following Monday.

On October 14, 2020, there was another hearing in the case. Father's attorney appeared. The caseworker testified that Father had completed only one court-ordered drug test and that he refused to take the court-ordered DNA test. She further testified that the permanency goal was termination of the parents' rights and adoption by relatives.

The trial judge extended the case's automatic dismissal date to May 22, 2021, and set the case for trial on February 2, 2021. *See generally* TEX. FAM. CODE ANN. § 263.401. The judge granted a continuance, and the case was actually tried on March 23, 2021.

Father appeared at trial only by counsel. Mother, the CPS caseworker, and the CASA worker testified. Mother later signed a mediated settlement agreement in which she agreed to sign a voluntary relinquishment of her parental rights. She also signed an affidavit of voluntary relinquishment.

On April 26, 2021, the trial judge signed an order terminating Mother's and Father's parental rights. A few days later, the judge signed an amended termination order nunc pro tunc. In the amended order, the judge found that Father constructively abandoned the children within the meaning of Family Code § 161.001(b)(1)(N) and that Father did not register with the paternity registry under Family Code Chapter 160 for the child A.D. The amended order terminated Father's parent–child relationship with both children.

Father timely appealed.

## II. Issues on Appeal

Father raises two issues on appeal. First, he argues that the evidence is legally and factually insufficient to support the trial judge's finding of constructive abandonment. Second, he argues that the evidence is legally and factually

insufficient to support the trial judge's termination ruling under Family Code Chapter 160 as to A.D.

### III. Standard of Review

Because terminating parental rights implicates fundamental interests, the clear and convincing standard of proof applies in termination cases. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). "Clear and convincing evidence" is the measure or degree of proof that will produce in the factfinder's mind a firm belief or conviction as to the truth of the allegations to be established. TEX. FAM. CODE ANN. § 101.007.

Our standards of review reflect the elevated burden at trial. *In re N.T.*, 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet.). Specifically, in both legal and factual sufficiency review, we consider all the evidence. *Id*. Under both standards we defer to the factfinder's determinations as to witness credibility. *Id*.

In a legal sufficiency review, we credit evidence that supports the verdict if a reasonable factfinder could have done so, and we disregard contrary evidence unless a reasonable factfinder could not have done so. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). However, we do not disregard undisputed facts that do not support the verdict. *Id*. at 113. Even evidence that does more than raise surmise and suspicion will not suffice unless it can produce a firm belief or conviction that the allegation is true. *Id*. If no reasonable factfinder could form a firm belief or conviction that the allegation is true, the evidence is legally insufficient. *Id*.

In a factual sufficiency review, we likewise determine whether the factfinder could reasonably form a firm belief or conviction that the State's allegations are true. *In re A.B.*, 437 S.W.3d at 502. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. at 503 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We must undertake an exacting review of the entire record with a healthy regard for the constitutional interests at stake. *Id*.

## IV.    Analysis: Issue One

In his first issue, Father challenges the legal and factual sufficiency of the evidence to support the trial judge's finding that he constructively abandoned the children within the meaning of Family Code § 161.001(b)(1)(N).

## A.    Applicable Law

The trial court may terminate the parent–child relationship if the factfinder finds by clear and convincing evidence that (i) the parent committed one or more acts or omissions listed in Family Code § 161.001(b)(1) and (ii) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b).

Here, the trial judge found that Father constructively abandoned the children within the terms of § 161.001(b)(1)(N). Under that subsection, a parent's rights may be terminated if the parent

constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and:

> (i) the department has made reasonable efforts to return the child to the parent;

> (ii) the parent has not regularly visited or maintained significant contact with the child; and

> (iii) the parent has demonstrated an inability to provide the child with a safe environment.

*Id.* § 161.001(b)(1)(N)(i)–(iii).

Father challenges the sufficiency of the evidence only as to prongs (N)(ii) and (N)(iii).

## B.  Evidence at Trial

The trial was held on March 23, 2021. Father appeared by counsel but not in person.

A February 5, 2020 status-hearing order, with both parents' service plans and Mother's visitation plan attached, was admitted into evidence. Mother's service plan contains the statement that Mother was "worried" about the children's health because they tested positive for methamphetamine when they were born. Her plan also says that Mother "tested positive" multiple times during her pregnancy and that the Department was "worried" because the children were born at only twenty-eight weeks. Father's service plan, which was dated January 2, 2020, included the following statement:

> The Department is worried about [Father]'s lack of participation in the case and him being uncooperative with the Department because this

could prolong the results of a DNA test for the children which would disrupt the Department finding permanency for the children.

Mother's visitation plan states that a parent's visits are immediately suspended if the parent tests positive for drugs and that visitation may be reinstated if the parents passes two urine analysis drug tests two weeks apart. The visitation plan is dated January 3, 2020, and mentions only Mother, not Father.

The CPS caseworker on this case, Savannah Ulch, testified that the children were born in September 2019, that the Department had been the children's temporary managing conservator since November 2019, and that the children had been placed with Mother's aunt and uncle since about March 2020. Ulch named Father as the children's "father or alleged father." She said she had had one or two conversations with Father about the court-ordered services, DNA testing, and drug testing. Otherwise, her primary method of contacting Father was text messaging, and her messages were usually to "inform him of his twenty-four hour notice for drug testing." Ulch "could count on one hand" the times he texted her back. Once he was upset when he texted her back. On that occasion, Ulch was asking him to take a drug test, and he refused to go. Ulch also testified that she prepared Father's family plan, that she spoke to Father about it, and that he said he understood that completing the plan would help him be reunited with the children.

Ulch further testified that she sent Father to random drug testing about ten to twelve times. He went once, in April 2020, and tested positive. He did not show up

for any other drug tests. Additionally, the court ordered Father to submit to genetic testing, and to Ulch's knowledge Father never complied.

Ulch had no knowledge that Father would be able to give the children a safe environment or provide for their needs. Father never asked Ulch how he could help provide for those needs. Regarding Father's living conditions, Ulch testified as follows:

> Q. Do you know if [Father] has a stable residence?
>
> A. I'm not sure if he does.
>
> Q. Have you attempted to inquire about that?
>
> A. I did. I've asked [Mother] before. I've tried to ask him and I believe I was sent an address a while ago. I—you know, it's hard whenever I can't get in contact with the parents to able to go out and see, you know, exactly what's going on or where they're at or anything like that. So I haven't seen his residence, but I'm not sure if that's still where he's at or not.

To Ulch's knowledge, Father had no visits or other contact with the children since before the CPS case started in November 2019. Ulch received no gifts, cards, or letters from Father that might indicate that he wanted a relationship with the children. Ulch was asked, "And would you say that through his own actions he's abandoned these kids?" and she replied, "I would say that. Yes, sir."

On cross-examination, Ulch was asked whether Father "work[ed] any services." She replied, "He was only court ordered to complete ongoing services and random drug testing and to my knowledge he did not complete any services."

On further cross-examination, Ulch agreed that, under the service plan, Father had to show the Department that he had a stable home for the children, that he could maintain a drug-free lifestyle, and that he had enough income to provide for the children. Father did not provide Ulch with information showing he had met any of the goals in his service plan. Indeed, Ulch testified, "I didn't receive anything from him."

The only other witness was court-appointed special advocate Katie Williams. She had been the advocate on the case since December 2019. She was not aware of Father's having any visits with the children, and she had not received any cards, gifts, or letters from Father that would suggest he wanted a relationship with the children. In fact, she had had no contact with Father. She had no idea whether Father could provide the children with a safe and stable environment, but she agreed that his drug-testing history was some evidence he could not. She also agreed that Father provided the Department with no proof of a safe, stable home environment or ability to financially support the children. She opined that Father was aware of what was necessary to have visitation with the children but chose not to comply with those requirements.

## C.    Application of the Law to the Facts

### 1.    Prong (N)(ii): Failure to Visit or Contact the Children

Father argues that the Department presented legally and factually insufficient evidence that Father did not regularly visit or maintain significant contact with the

children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N)(ii). For the following reasons, we disagree.

Ulch testified that she had no knowledge of Father's ever visiting the children or having any contact whatsoever with them during the entirety of the case. She also testified that she received no gifts, cards, or letters for the children from Father. Williams also testified that she was unaware of Father's having any visits with the children while she was on the case and that she had not had any contact with Father. The trial judge could have credited this undisputed evidence and reasonably concluded by clear and convincing evidence that Father never visited or contacted the children while the case was pending (from November 2019 until trial in March 2021).

Father does not argue that there was evidence that he visited or contacted the children. Instead, he argues chiefly that his failure to visit or maintain contact should not be held against him because the Department prevented him from visiting the children. This argument implicitly raises a question of statutory construction—it assumes that subsection (N)(ii) requires a *voluntary* failure to visit or maintain contact with children. But subsection (N)(ii) says nothing about voluntariness of a parent's failure to regularly visit or maintain significant contact with a child. Thus, it is unlike other abandonment grounds under § 161.001(b)(1), such as subsection (C)'s requirement that that parent have "*voluntarily* left the child alone or in the possession of another . . . for a period of at least six months. *Id*. § 161.001(b)(1)(C)

–10–

(emphasis added); *see also id.* § 161.001(b)(1)(B); *id.* § 161.001(b)(1)(H). Nevertheless, it appears that Father would have us read something like a voluntariness requirement into subsection (N)(ii). *But see Krasnicki v. Tactical Entm't, LLC*, 583 S.W.3d 279, 282 (Tex. App.—Dallas 2019, pet. denied) (courts presume that omissions from statutes are purposeful).

We recently confronted similar facts and arguments in *In re X.A.S.*, No. 05-19-01082-CV, 2020 WL 1042520 (Tex. App.—Dallas Mar. 3, 2020, no pet.) (mem. op.). In that case, a mother's parental rights to her son were terminated under § 161.001(b)(1)(N), and on appeal she argued that the Department had "unreasonably thwarted" her efforts to visit her son after she no-showed a drug-test. *Id.* at *5. The case involved the same court policy involved in the instant case, under which a failed or missed drug test automatically suspended visitation until the parent passed two subsequent drug tests. *Id.* We rejected the mother's argument, concluding that the Department did not unreasonably thwart her visitation because submitting to drug testing to regain visitation was within the mother's control and yet she failed to appear for those drug tests.[1] *Id.* at *6. Here, we conclude that the Department did not unreasonably thwart Father's possession and access, because submitting to drug testing to regain access to the children was within his control. He tested positive for

---

[1] Other courts of appeals have used a similar analysis. *See In re K.P.*, No. 11-20-00001-CV, 2020 WL 4038858, at *3 (Tex. App.—Eastland July 15, 2020, no pet.) (mem. op.) (citing cases including *X.A.S.*).

–11–

drug use once, and he failed to submit to at least ten other tests that he was directed to complete.

Next, we turn to Father's specific arguments as to why the Department's evidence is insufficient.

First, Father argues that the evidence of subsection (N)(ii) is insufficient because the Department prevented him from visiting the children based on a court order that forbade visits after a failed drug test. For support, he relies on *In re F.E.N.*, 542 S.W.3d 752 (Tex. App.—Houston [14th Dist.] 2018), *pet. denied*, 579 S.W.3d 74 (Tex. 2019) (per curiam). But *F.E.N.* is not on point. As we noted in *X.A.S.*, 2020 WL 1042520, at *6, the trial court in *F.E.N.* barred the father from visits even after the father complied with court orders that required paternity and drug testing. *See In re F.E.N.*, 542 S.W.3d at 759, 763. In this case, by contrast and like in *X.A.S.*, there is evidence that the Department repeatedly asked Father to submit to drug tests, that Father would have been eligible for visits if he had taken and passed those tests, and that Father never complied. Thus, there is evidence that the Department offered Father the means to regain the right to visit the children.

Father next argues that there was evidence that he had contact with the Department both in person and through text messages. This is correct. Ulch testified that she had one or two in-person conversations with Father about the court-ordered services, DNA testing, and ongoing services. However, this evidence did not establish that Father showed any desire to visit or otherwise contact the children.

–12–

Ulch testified about only one specific text message from Father in which he was upset and refused to go for a requested drug test. In sum, the evidence about Father's contacts with the Department did not show that Father ever sought to visit or contact the children, and it did not rebut the Department's (N)(ii) evidence.

Father also argues that the Department's evidence that he lost the ability to visit the children because he failed a drug test was conclusory and thus incompetent to support the subsection (N)(ii) finding. We disagree. Testimony is conclusory if it presents a conclusion without the underlying facts to support it. *Saronikos, Inc. v. City of Dallas*, 285 S.W.3d 512, 516 (Tex. App.—Dallas 2009, no pet.); *see also conclusory*, BLACK'S LAW DICTIONARY (8th ed. 2004) ("Expressing a factual inference without stating the underlying facts on which the inference is based"). Ulch testified that Father went for court-ordered drug testing only one time, on April 17, 2020, that he "was positive on those drug tests," and that this test result caused Father not to be able to participate in visits. The evidence also included Mother's visitation plan, which supported Ulch's testimony about the visitation rules. We conclude that Ulch's testimony about the reason Father could not visit the children was not a conclusory factual inference that required additional supporting facts beyond those presented in the trial evidence. Thus, Father's argument is without merit.

Finally, Father argues that there was no evidence that he was notified that his visits would be suspended if he failed a drug test or that he could do anything to

resume visits once they were suspended. Assuming for the sake of argument that the Department bore a burden to prove that Father knew about the policies governing drug tests and visitation, we conclude that the Department carried that burden through Ulch's and Williams's testimony. First, Ulch testified that she created Father's family plan in January 2020, that it required him to complete random drug testing, and that she made him aware that completing the plan would help him be reunited with the children. She also testified that she contacted Father repeatedly to instruct him to submit to drug tests. Second, Williams testified specifically that Father knew what he needed to do to regain eligibility to visit the children:

> Q.    And with regards to the court's policy on drug testing and visitation, you're familiar with that policy, are you not?
>
> A.    I believe so. Yes.
>
> Q.    Okay. And [Father] has appeared in person, in this courtroom, prior to the court turning to Zoom. He appeared in person in front of Judge Akin on more than one occasion, isn't that right?
>
> A.    Yes. That's correct.
>
> Q.    Okay. And so is it—is it your opinion that [Father] is also well aware of what is necessary in order to reinstate his visitation with his children, if they are, in fact, his children?
>
> A.    Yes.

Based on this testimony, the trial court could reasonably find that Father knew what he needed to do to regain visitation rights after he failed the April 2020 drug test.

After considering Father's arguments and applying the proper standards of review, we conclude that the evidence was legally and factually sufficient to support

the trial judge's finding by clear and convincing evidence that Father did not regularly visit or maintain significant contact with the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N)(ii).

## 2. Prong (N)(iii): Inability to Provide a Safe Environment

Father argues that the Department presented legally and factually insufficient evidence that Father demonstrated an inability to provide the children with a safe environment. *See id*. § 161.001(b)(1)(N)(iii). His argument rests entirely on the fact that the Department did not present any direct evidence of Father's living conditions. For the following reasons, we disagree with Father's argument.

The living conditions at a parent's residence are obviously relevant to the determination of whether the parent can provide children with a safe environment. However, Family Code § 263.307 identifies many other factors that are also relevant to whether a parent is "willing and able to provide the child with a safe environment." *Id*. § 263.307(b). These include the following:

(1)    the child's age and physical and mental vulnerabilities;

. . .

(8)    whether there is a history of substance abuse by the child's family or others who have access to the child's home;

. . .

(10)  the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

. . .

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

    (A)    minimally adequate health and nutritional care;

    (B)    care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

    (C)    guidance and supervision consistent with the child's safety;

    (D)    a safe physical home environment;

    (E)    protection from repeated exposure to violence even though the violence may not be directed at the child; and

    (F)    an understanding of the child's needs and capabilities . . . .

*Id.*; *see also In re E.M.*, No. 05-18-01161-CV, 2019 WL 1449791, at \*4–6 (Tex. App.—Dallas Apr. 1, 2019, no pet.) (mem. op.) (applying the § 263.307(b) factors in a § 161.001(b)(1)(N)(iii) sufficiency analysis); *accord In re S.B.*, No. 05-20-00055-CV, 2020 WL 5361877, at \*6–8 (Tex. App.—Dallas Sept. 8, 2020, no pet.) (mem. op.) (same).

As discussed below, several § 263.307(b) factors weigh in favor of the trial court's finding that Father has demonstrated an inability to provide the children with a safe environment.

**The child's age and physical and mental vulnerabilities**. Evidence showed that the children were about eighteen months old at the time of trial. Ulch testified that, at that age, the children needed constant attention. The trial court was entitled to take the children's young age into account in assessing whether Father

–16–

demonstrated that he could provide them with a safe environment. *See* Tex. Fam. Code Ann. § 263.307(b)(1).

**History of substance abuse**. There was evidence that Father took one drug test during the pendency of this case, tested positive for drugs, and refused to appear for any other drug tests even though requested to do so anywhere from nine to eleven times. The trial judge could reasonably draw an inference that Father also would have failed the other drug tests if he had appeared for them. *See In re K.B.*, No. 05-17-00428-CV, 2017 WL 4081815, at *4 (Tex. App.—Dallas Sept. 15, 2017, no pet.) (mem. op.). Thus, the trial judge could reasonably conclude that Father was using illegal substances and that this factor weighed against his ability to provide a safe environment for the children. *See* Tex. Fam. Code Ann. § 263.307(b)(8).

**The parent's willingness to cooperate with an appropriate agency's close supervision**. The Department presented evidence that Father was unwilling to cooperate with the Department. Ulch testified that she prepared a family plan for Father that required him to complete random drug testing, to complete ongoing services, and to "keep up with the department, about how he was doing." She spoke to him about the plan and made him aware that completing the plan would help him be "reunified" with the children. After that, Ulch requested Father to undergo random drug testing "[t]en to twelve times." He went only one time, and he tested positive on that occasion. He failed to show up for any other requested drug test. The trial court also ordered Father to take a genetic test, and he never complied.

Ulch also testified that Father was generally uncommunicative, saying, "I haven't been able to have a steady conversation with him or continuous conversation over these past, you know, the past year." She sent him text messages several times, both about random drug tests and just to see how he was doing, but she "could count on one hand" the number of text messages he sent back. She remembered in particular that he was "upset" when he sent her a text message refusing to go take a drug test. He never asked her any questions about what was required of him with regard to the children. She testified that Father had the burden to show the Department that he had stable housing, and she never received anything like that from him.

Williams testified that Father appeared in court more than once and that he was well aware of what he needed to do to have visitation with the children. She opined that Father chose not to comply with the requirements.

Based on the evidence, the trial judge could reasonably conclude that Father was unwilling to cooperate with the Department to be reunited with the children, and that this factor therefore weighed in the Department's favor on Father's inability to provide a safe environment. *See id*. § 263.307(b)(10).

**Adequate parenting skills**. There was circumstantial evidence tending to show that Father lacked adequate parenting skills: he failed the only drug test he took, he did not appear for any of the many other drug tests he was requested to take, and he never visited the children. *See In re N.A.V.*, No. 04-19-00646-CV, 2020 WL

–18–

1250830, at *8 (Tex. App.—San Antonio Mar. 17, 2020, pet. denied) (mem. op.) (parent's failure to visit or contact children was relevant to adequacy of her parenting skills). And Father's failure to testify allowed the trial judge to draw an adverse inference on this relevant subject that was within Father's personal knowledge. *See Am. Gen. Ins. Co. v. Nance*, 60 S.W.2d 280, 284 (Tex. App.—Dallas 1933, writ ref'd) (adverse inference may be drawn from litigant's failure to testify); *see also In re M.S.*, No. 02-21-00007-CV, 2021 WL 2654143, at *17 (Tex. App.—Fort Worth June 28, 2021, pet. denied) (mem. op.) (where mother's live-in boyfriend failed to testify, "[a] sizeable piece of Mother's stability and safety puzzle was missing").

Thus, the circumstantial evidence supported a reasonable inference that Father lacked adequate parenting skills. *See generally* TEX. FAM. CODE ANN. § 263.307(b)(12).

After considering Father's arguments and applying the proper standards of review, we conclude that the evidence was legally and factually sufficient to support the trial judge's finding by clear and convincing evidence that Father demonstrated an inability to provide the children with a safe home environment. *See id.* § 161.001(b)(1)(N)(iii).

### D. Conclusion

We overrule Father's first issue. Because our holding suffices to require affirmance of the judgment, we need not address Father's second issue. *See* TEX. R. APP. P. 47.1.

## V.    Disposition

We affirm the trial court's Agreed Judgment Nunc Pro Tunc.


/Dennise Garcia/
DENNISE GARCIA
JUSTICE

210244F.P05



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

IN THE INTEREST OF I.D. & A.D., MINOR CHILDREN

No. 05-21-00244-CV

On Appeal from the 354th Judicial District Court, Hunt County, Texas Trial Court Cause No. 88200. Opinion delivered by Justice Garcia. Justices Myers and Partida-Kipness participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered September 17, 2021.